Good morning, your honors. My name is Ben Coleman. I represent the appellant Theresa Fisher. My plan was to focus on the first two issues in the briefs, which are the admission of the co-defendant's confession and the exclusion of the undercover recording. And then what I was going to do was discuss prejudice or harmless error at the end, because I think you should look at everything cumulatively. With respect to the first issue, the admission of the co-defendant's confession, I think the parties are at least in agreement on one thing, and that's the standard of review for this one. I concede it's plain error, standard of review. But I believe the government concedes plain error. We differ as to what the extent of the error was, but the government concedes it was a plain hearsay error. Our position is that it's clearly a confrontation clause violation, and I don't think the government really disputes that, because the co-defendant's statements were testimonial statements. She didn't testify. There was no cross-examination. So you have a confrontation clause. Let me ask you this. Does a lawyer have to object to every bit of evidence that is theoretically objectionable? I think you got me on that question. I'm not sure I understood it. I mean, lawyers all the time decide that this is not an evidence exam. You don't have to identify every item of testimony that is possibly subject to objection. Lawyers make decisions. That testimony comes in. I may have a valid objection, but it's not worth objecting over. Isn't that right, Arnett? Isn't that what lawyers do all the time? Yes. If you're suggesting that maybe this was a strategic decision, that the lawyer somehow made a decision that he didn't think the testimony was a big deal, so he just didn't object to it, frankly, I... If there's anything to that, isn't the place to raise that in a 2255 motion, in effective assistance, rather than here on this direct appeal? Well, I mean, certainly that could be a potential alternative, but I think the law is fairly clear that under Rule 52 and longstanding both Supreme Court and Ninth Circuit authorities that we have the plain error doctrine. Claims can be forfeited, and that's what appears to have occurred here. A waiver is when it's clear from the record that the defendant herself acknowledged this was a problem, I don't care, I'm going to let the co-defendant's confession come in. That's not what occurred here at all. There was no discussion, no colloquy where either the defense lawyer and the defendant herself got up there and said, it's okay, let the co-defendant's confession come in. I mean, we really don't know what defense counsel and the defendant talked about at this stage in the case, do we? No, you don't. But I don't think you need to go there. I think that this is a classic forfeiture situation, not a waiver situation. Why is that? Well, I think actually even Judge Tashima's opinion in Perez, which is the leading in-bank decision between the difference between forfeiture and waiver, in that case the defense lawyer actually suggested the instruction that the district court gave, and this court still held that it was only a forfeiture, not a waiver. We don't have that here. This is an error that was missed. It was missed by everybody. The government in this situation, they maintain some responsibility to prevent this type of error. When they want to jointly try defendants together, and they want to introduce one of the defendant's confessions, the responsibility is on them, too, to make sure that you're going to have a clean joint trial. So I think this is classic forfeiture territory, and it's a plain error. And it's our position it's a brutal error. I mean, this is, to think that a lawyer would actually let the co-defendant point the finger at his client and say it's all okay, and I don't even get to cross-examine that defendant, I mean, that's an extraordinary situation. Yeah, just as a quick factual question, at the tail end of the agent's testimony, I think Ms. Hargraves is her name? Correct. She's asked, so who did you, who on the inside, basically, did you send your people to? And she says, Ms. Fisher. Correct. And then the person, I guess she was asked, and if she wasn't available, who, did you send it to someone else? And what was her, what was Ms. Hargraves' answer? It was the co-defendant, V. Nguyen, who was the cooperating witness. Yeah, yeah, got it. That's what I thought. So I mean, this is, I mean, this is, the Supreme Court has described this as such an egregious type error that a limiting instruction can't even cure it. I mean, that's how important this type of error is. So, you know, to me, this is classic forfeiture, not waiver. We've got a plain error here. Everybody agrees there was a plain error. And the government hasn't contended, by the way, the government has not contended that this was a waiver. They've waived the waiver issue. They agree it's a forfeiture and a plain error. So we've got plain error, and I'll discuss the prejudice at the end. I'd like to move to the second issue, which is the exclusion of the undercover recording. On this issue, I think the parties are just in different areas about whether there was adequately, adequate, adequate preservation. Let me ask you what your position is. There's, because I traced, I appreciated in your reply brief, you kind of walked us through the whole chronology. But is the key point when your client was on the stand, and I guess this was on redirect where the defense lawyer asked first about, well, isn't it true that you earlier made statements where you denied, I wasn't talking about, and the judge basically shuts him down. And he says, well, your honor, I have three other areas without specifying what those other areas were. Is your position that we have to be able to infer that one of the areas that defense counsel wanted to go into was in fact the videotape? Well, I think there are two key areas. In order for this argument to be properly preserved? I don't think you have to find that. I think that what was done leading up to that was there are two key areas, and that is right before Ms. Fisher hits the witness stand, the government, right before she hits the stand, says, your honor, defense counsel has told us they want to introduce the undercover recording. And we want to make sure that your pretrial ruling, that it can't come in, stays. And the judge says, listen, you're right, the ruling stays. I can't always predict 100 percent everything that's going to happen at a trial, what's going to happen on her testimony, but you're correct, my ruling stays. So let's stop right there. And let's assume that defense counsel didn't do anything further to get this tape admitted. Is your position that that was enough to preserve this argument that you're now making? That the district court had made a definitive ruling that that is not coming in, so don't even waste your time when you get up there trying to bother to get into it? I think it's a closer call. I think that, I mean, I think there are cases that talk, I mean, I think that ruling is probably definitive. If you, I mean, I think it'd go either way. You could say, well, she left a little bit, she left a sliver of daylight there that maybe her mind could change. I think it's a pretty small sliver. But, you know, I don't think the court has to address that issue, because I think what he did after the fact, everybody knew. I mean, the judge did not say, your honor, I have no, I mean, counsel, I have no idea what you're talking about. What are these other areas? The government didn't say, we have no idea what he's talking about. The entire time, there were two statements that were linked throughout the history of the case, the post-arrest statements and the undercover recording. Everybody knew what was going on at the time. And, you know, frankly... But let me just, can I, let me push back, because what defense counsel implies here, I'm just looking at this particular page, is I have other areas of questioning that I want to get into with this witness. Isn't that different from, I want to play this 45 minute tape for the jury? I just didn't see any place in the record where defense counsel said, your honor, now's the time where I want to hit play, because that's what needed to happen, right? In order for this argument you want us to reverse on to be preserved. Well, I'll sit, and when I sit down, I'll look at the exact verbiage you used. But I think he says, I have other similar areas. He used the word similar. I'll read it to you. Okay. Okay. The judge says sustained, and he says, this is Mr. Stewart. Your honor, I have three other areas that I intended to go into with some similar questioning. Would the court's ruling be the same on all three? And the judge says it would. I guess I inferred from that that he wanted to ask your client further questions about, I don't know, prior statements she made in some other context. But what we're talking about is, I want to play this tape for the jury. And I just, it seemed to me, obviously it would have been better had the lawyer at some point said, your honor, I'm offering exhibit whatever into evidence. And the judge said, no, it's not coming in. Then we wouldn't be here. Well, maybe we would, maybe we wouldn't. I don't know. But I think the court's ruling was going to be the same. There's that line where the issue has been litigated so thoroughly throughout the trial. You want to be respectful to the judge and their rulings. And when everyone, the judge didn't seem to be confused. No one seemed to be confused. And there's also a jury sitting there. I mean, you know, the Christian language from the case that we said in our reply brief, maybe the offer of proof was, quote unquote, inartful, but it was good enough. And I think that's what, the question is, did the district court know what was going on? And I think the district court exactly knew what was going on. I don't think there was any real debate there. But even if the court were to say, well, the issue was not adequately preserved and it's plain error, I'm still not sure what the government's argument is as to why. But there's no plain error if there was never an attempt to introduce the tape. That's why I think this is different from the argument you were just making. If there was never an attempt to get the tape introduced, there's just no, there's nothing to argue about. Right? I mean, maybe you have an ineffective assistance claim in the purest sense that the strategic call supposedly that was made by defense counsel was just, you know, beyond the pale. But you've got to be able to point to somewhere in the record where the lawyer tried to get that tape introduced. And unfortunately the posture that the written motions came in, there was never an attempt on your client's part to get it introduced. It was only an attempt by the government to keep it out. Well, you know, I, I agree it's motions to exclude by the government, but he's at the eliminate hearing saying, I'm adamant. I want this tape in. They then have a second hearing. He wants the tape in. Oh, at that point they say it's resolved. They say it's resolved. That's the problem. But he says, I, the parts of the recording that I want in, they've, they said, you know, it's in the tape. So I'm satisfied. I mean, I'm saying I'm satisfied with what's coming in. Then right before she hits the witness stand, he says, you know, they, they acknowledge he says he's going to go there. And then, I mean, it just seems to me that that's an awfully high standard to hold a, a trial lawyer to when everybody knows what's going on. I mean, you know, it's, I don't think it should be a game of gotcha. It's clear what's going on in this case. You know, I know I'm already over the time. I just wanted to hit prejudice a little bit. But, you know, it's our position that, I mean, we're hoping that the court will find two errors and you have to look at accumulative. In this case, we have, and if you find that, for example, the second error is preserved, then you don't use the plain error prejudice standard. You use accumulative, just regular harmless error standard. And it's our position that when you have extraordinarily damaging evidence from the co-defendant, the most egregious type of evidence, at least that Supreme Court can, can identify, that a limited instruction doesn't cure. And you've got key evidence that the defense, the defense won't introduce to corroborate her very own testimony, that when you put those factors together, you've got prejudice in this case and a reversal for a new trial is warranted. Okay. Thank you. We'll give you some time for rebuttal. Good morning, Your Honors. May it please the Court, Mark Tackle on behalf of the United States. The government did not concede plain error with respect to the Bruton issue. The government conceded error in the fact that there should have been a limiting instruction. So I want to make that clear. We didn't concede. Well, no. I mean, you, I don't know if you were the lawyer who asked the question, but the government had no business eliciting that response. I, I, I agree, Your Honor. I agree. But I think the error that we agree that was occurred here is the fact that a limiting instruction shouldn't have been given. No. Well, okay. Let's just put the statement in context because it was much more damaging, I think, than what you were willing to concede in your brief. You have an outsider to the that she's engaging in some kind of fraud and then says, oh, yeah, and then is asked, and so who, who, who on the inside did you send your people to? And she fingers the defendant. Then she's asked, and that's what I wanted to clarify this. And if, if Ms. Fisher wasn't available, who did you send your people to? And she says the, the other, the cooperator who gets on the stand and testifies, yeah, we knew all about it. So I don't think there's any other inference from that, that response other than that it was incredibly incriminating for Ms. Fisher, right? You can't interpret that. You can't put, you're not going to be able to put another spin on that, that it was somehow just innocuous. I can see that point, Your Honor. I think the piece of it where we would ratchet it back and say it's not as prejudicial as, as that is because the defense argument, defendant's argument throughout this trial was that people were conspiring on the outside. They were kind of a dupe where she was just assigning people to patients, scheduling people with the doctors, and that she didn't actually know that these people didn't have these symptoms. And so the closing argument that defense counsel made was really, she's just a dupe. People were conspiring before she came in. And really the only thing that was happening was that Hargraves was referring patient, was referring patients to come and talk to one of the two people that were actually working there. The only two people that were the consultants. The only two people that defense counsel conceded in the opening that patients would be talking to. And so that's where we would take a little bit of a step back and ratchet it down and say that's not, based on the argument the defendant made during the trial, that we don't think it's as prejudicial as the defendant's making it out to be. Well, but it's clearly a prudent error. It's not, it's not something that a limiting instruction can cure. That's why I guess I just disagree with you that that's supposedly the, the fault here. I mean, that question should never have been asked. It was totally gratuitous, had nothing to do with the proper reasons why Ms. Hargraves' statement was being admitted against her. And it's, to me, it's a classic prudent error. I don't, you're not going to persuade me that a limiting instruction would have cured that problem. Now, I mean, we still have a harmless error inquiry to get to. Yes, Your Honor. Then I'll move on to that, that point. You know, in this case, the guilt, evidence of guilt was just clearly overwhelming. We have five patients that came in and testified that the defendant coached them on symptoms of what to say to the doctors and also told them that they could get cosmetic surgery by using their insurance. We also have a hundred and seventy forged Dr. Chung letters. These are, these are letters that Dr. Chung testified he never made. He never saw these patients. And some of the patients that we had testified about the letters also stated that we had never, they had never seen Dr. Chung. Defendant testified herself that her writing was on six of them. So she essentially admitted to that her handwriting and that she wrote, you know, six of these forged Dr. Chung letters. And then she ultimately moved to admit government exhibit number 111, which was an exhibit that we had created as to use as a handwriting, in order to show witnesses when we're trying to identify whose handwriting it was. And she admitted this, admitted the document at trial. And this was clearly perjurious testimony because these, this was a document that she, of course, didn't commit. And of course, Jimmy didn't tell her to, to make, which was what her testimony at trial was. We also have her being paid as a salesperson, upwards of $1,250 per insurance-based procedure, a lot less for a cosmetic. And essentially what she was doing was she was selling patients on insurance-based procedures because that was more money back into the pocket of the clinic. She made $225,000 in 2010, approximately the same in 2011, which is a ridiculous amount of money that somebody would be making if all they have to do as defendant testified was, you know, speak with the patients, refer the patients to a doctor. We also have text messages and recordings that show that insurance can pay for cosmetic procedures and that, and showing also her coaching of patients. TB stated that she wanted to have her tummy and boobs done, which is clearly a cosmetic procedure. And then further asked, when you say I have bleeding, is it a heavy period or when I have to pee? And the defendant responds, heavy period, bladder incontinence, trust me, it's worth the wait. We also have separate text messages that we offer to corroborate this from N, L, M, G, asking for cosmetic surgeries, such as liposuction, vaginal reconstruction, tummy tucks and breast augmentation, and asking if those surgeries can be billed to insurance. And each of those text messages, the defendant says yes. So, and this was in contrary to the defendant's own testimony that the doctor makes all these determinations. So she testified that I don't know anything about cosmetic surgery, it's the doctor that makes all these determinations. Yet she's telling all these patients, yes, cosmetic surgeries can be paid for by insurance. And so when looking at all this evidence... Can I ask you for a second? What was the import of Hargrave's testimony? What was the import? What was her statement of her statement? The statement was the agent testified, so who do you see at Vista? Who do you refer patients to at Vista? And the agent testified that Hargrave said, number one, Fisher. And then the agent testified also that Hargrave's told the agent, if she's not there, who do you see, V. Nguyen, would be the other person. So that's essentially the statement. Now as to that, was that when Fisher took the stand, right? Correct. Yes, Your Honor. Was that contradicted by her in any way? No, I don't believe so. I don't remember any testimony along those lines. She didn't mention Hargrave's at all when she testified. Okay, thank you. Moving down to the undercover... Yeah, let's talk about the tape. The video. So what is your... I mean, I was shocked when I read, picked up your brief because, yeah, you guys did seem to be talking about two totally different cases. So your position is that they basically just made a strategic call not to try to put it on? Yes, Your Honor. They said early on, or at least Mr. Stewart said early on, that the video was resolved. And so the judge clarified that, we clarified that at the end of the motion in Lemonade. I do disagree with defense counsel that Mr. Stewart told us before Fisher's going to offer the video. That's not, that's not what happened at all. And I know Mr. Coleman doesn't have the benefit of being there. The reason why we raised it at that particular time was because it was cross-examination of the agent regarding the interaction of, and that undercover video was done. And we think that was a strategic decision because defense counsel, in his closing argument, made a big to-do about how the government could have presented this video, and it chose not to, and that the government must be hiding something. Well, there's a place, I was trying to remember where it was, because I don't know if it was you or your co-counsel, but I thought it was before the defendant testified that you guys got up and said, Your Honor, we thought this issue had been resolved, but Mr. Stewart, Stewart or Stewart? Stewart, Your Honor. Has told us he now wants to go there. No, no, no. And you've got to read that carefully again. Tell me where it is. You know, I'll have to, I'll have to, it's, it's, I might have to do some supplemental briefing, Your Honor, I don't know that off the top of my head, but the clear import of it was, the court says, I thought this issue was resolved, and then Mr. Robbins, who was the AUSA on it, says, we thought so too, but Mr. Stewart seems to be going there. Now, he doesn't say that he told us the video was coming in. The reason why he raised that at that particular time was because of cross-examination of the case agent where the defense counsel elicited statements regarding that an undercover video had been made. Right. And so it wasn't Mr. Stewart saying, we want to offer this. What it was, was he's cross-examining it to create his point of, you know, the government conspiracy that they're withholding evidence. And that's why we raised it again at this point. And the judge said, I thought that was resolved too. And so that my ruling is, is, is, is, is the same. However, however, she also says, but things change during trial and I don't know what anyone is ever going to do. So it certainly left the door open for her. And I would think from the standpoint of I think the judge's ruling is more definitive than that. I mean, you, you guys asked for a pretty definitive ruling that this video, I think you're wrong. I thought it was before you guys cross-examined Ms. Fisher because you wanted to be sure that you weren't going to open the door to having it admitted by asking her questions about what she might have said during the meeting with the undercover agent. Let me just be clear. I think the government's interpretation on hearsay was just totally wrong. You guys needed to go back to law school and take evidence again. But the, um, but what the judge said was, you're right. As long as you guys don't ask her during cross about what she might've said to the agent, this cannot come in. And I don't know why wouldn't the defense lawyer be entitled to say, well, I got my ruling. I'm, I'm not going to be able to admit this. I think the, the follow-up where she's also says, the judge says, uh, things change throughout the trial. Um, and I don't know what anyone else is going to do. Um, I think that opens the door for the defense counsel now to try and offer that video in some way or another. Um, and that's what never occurred in this case. I also note that the, the ruling wasn't so much, um, was premised on the fact that, um, the government stated, we thought that this had also been resolved, um, in advance of trial. And in no time did defense counsel stand up and say, no, this wasn't resolved. We need a definitive ruling on it. So I think there's a lot of things going on here, but I don't think the situation is such that defense counsel definitively told us or implied to the court that it wanted to go ahead and offer this video and that intended offer this video and that defendant's failure to do so, um, is essentially waived, um, for purposes of, or at least forfeited. And then if the court doesn't go that far, it's waived. And I do, I notice my time has run out. Um, I agree with the court's assessment that we should have, uh, had I known about that Mateo case and had that been properly raised, um, we wouldn't have taken the position we did on the video. We thought it was hearsay initially. Um, obviously in hindsight it's 2020 sometimes and we probably wouldn't have been so vehemently opposing it had we been made aware of the Mateo case. Especially because you laid out a, such a compelling case for guilt. Uh, you would have thought you could have handled the, whatever was on that video, which is the other problem that we don't really know for sure what was on there other than one statement that seems quite favorable for, for the defendant. Yes, Your Honor. I think the video is lukewarm in the end, in the end. Um, you know, there's to both sides and the evidence testimony we thought was so overwhelming, um, that in the end the video wasn't necessary. Um, and, and obviously we think that there's just overwhelming of evidence of guilt here that, uh, there's just no prejudice on any standard. Okay. Thanks very much for your argument. We'll, uh, give you a couple minutes for rebuttal. Thank you. Just on, on the Bruton issue, Your Honor, the, the government is acting like there was just, uh, what Hargraves said wasn't contested at all. The whole point of them introducing Hargraves' confession, Hargraves was running the same defense basically that Ms. Fisher was running, which is that to the extent fraud was going on, it was these patients who were coming in and lying about what they needed so they could get discounted cosmetic surgery. So Hargraves' confession totally undermines both of their defenses. And then Hargraves, not only does she say, yeah, I was recruiting these people to do this fraud, I was sending them to Ms. Fisher, which Ms. Fisher completely denied in her testimony. I mean, that was undercutting her entire defense. This wasn't some stipulated issue. So it was, it was extraordinarily harmful. Um, now with respect to the undercover statement, I'm not sure I quite understood what the government was saying, that somehow this was all related to the case agent and how the recording was being used with the case agents, but that's what the prosecutor, this is Mr. Robbins, says is that was the undercover recording of the undercover meeting. That was my understanding that that had not been an issue. Mr. Stewart now has indicated that he wants to go there. Okay, we know he wants to go to the undercover recording. My understanding was, as you just said, that he's not really permitted to get into it on direct. If we don't get, so he's clearly talking about Ms. Fisher's testimony, not the undercover agent. If we don't get into it on cross, their cross of Ms. Fisher, somehow in a way that doesn't get admitted. And then the court says, that would be correct, but things change during the course of trial. And I don't know what anyone is going to do. And the prosecutor says, understood your honor. But the court says, but yes, you have the gist of it. So this is exactly, he wants to bring the undercover recording in, in Ms. Fisher's testimony and the government saying, Hey, Hey, he can't do that. This recording that by the way, not once in the pretrial pleadings during the trial, did the government ever say, Oh, it's a mixed bag. Oh, there's some stuff that helps us. There's nothing like that at all. All you have is the government filing two written and limited motions to exclude the recording. Again, they're so concerned about the recording that before she hits the stand, they want a confirmation that he can't do it. This is an extraordinarily helpful fact for the defense. It's not, yes, the recording is not in the record, but typically when people make proffers, the court isn't going to try an entire case based on evidence that's not coming in. The lawyers make a proffer. This is what the evidence shows. If they wanted to say, no, the evidence shows something different, your honor, they should have said it. They didn't. They never did until now. Now they want to come up here and say, no, it's not that helpful to the defense. It's clearly helpful to the defense. That's why they had no interest in having that recording. That's why they filed two motions and again, came into trial and said, don't let it in. And when you take that error, the only thing that could corroborate her own testimony and you take the co-defendant's confession, which points the finger right at her, this was a tainted trial. She should at least get a fair trial where she can testify again, lay out her defense and the government doesn't get to use improper evidence to convict her. And that's our position in the case. Okay. Thanks very much. Appreciate the arguments in this case. That concludes our calendar for today. The court will adjourn for the day and we'll be back tomorrow. Thanks very much.  All rise.
judges: Tashima, Silverman, Watford